# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE MANNING

MAGISTRATE JUDGE NOLA

in the Matter of

    SUSAN L. SWATZELL, on behalf of herself and all others similarly situated,
    vs.
    BAXTER INTERNATIONAL INC., HARRY M. JANSEN    Case Number:
    KRAEMER, JR., and BRIAN P. ANDERSON

02C 6175

**APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:**

    SUSAN L. SWATZELL

DOCKETED AUG 2 9 2002

FILED 8-29 02 AUG 28 PM 4:19 U.S. CLERK DISTRICT COURT

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME Carol V. Gilden | | | NAME Michael E. Moskovitz | | |
| FIRM Much Shelist Freed Denenberg Ament & Rubenstein, P.C. | | | FIRM Much Shelist Freed Denenberg Ament & Rubenstein, P.C. | | |
| STREET ADDRESS 200 N. LaSalle Street, Suite 2100 | | | STREET ADDRESS 200 N. LaSalle Street, Suite 2100 | | |
| CITY/STATE/ZIP Chicago, IL 60601 | | | CITY/STATE/ZIP Chicago, IL 60601 | | |
| TELEPHONE NUMBER (312) 621-1403 | | FAX NUMBER (312) 621-1750 | TELEPHONE NUMBER (312) 621-1729 | | FAX NUMBER (312) 621-1750 |
| E-MAIL ADDRESS cgilden@muchshelist.com | | | E-MAIL ADDRESS mmoskovitz@muchshelist.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06185530 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 062377 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ |
| TRIAL ATTORNEY? | YES ☒ | NO ☐ | TRIAL ATTORNEY? | YES ☒ | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

| (C) | | | (D) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME | | | NAME | | |
| FIRM | | | FIRM | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | | FAX NUMBER | TELEPHONE NUMBER | | FAX NUMBER |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SUSAN L. SWATZELL, on behalf of herself and all others similarly situated

## DEFENDANTS

BAXTER INTERNATIONAL INC., HARRY M. JANSEN KRAEMER, JR., and BRIAN P. ANDERSON

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Williamson
(EXCEPT IN U.S. PLAINTIFF CASES)

JUDGE MANNING

MAGISTRATE JUDGE NOLAN

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Carol V. Gilden/Michael E. Moskovitz
Much Shelist Freed Denenberg
Ament & Rubenstein, P.C.
200 N. LaSalle Street, Suite 2100
Chicago, IL 60601   (312) 346-3100

ATTORNEYS (IF KNOWN)

02C 6175

AUG 2 9 2002

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. Sec. 78(j)(b) Action for Securities Fraud

## VII. REQUESTED IN COMPLAINT

☒ CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:  ☒ YES  ☐ NO

## VIII.   This case

☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
8/28/02

SIGNATURE OF ATTORNEY OF RECORD
Carol V Gilden

**UNITED STATES DISTRICT COURT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**02 C 6175**

| | |
|---|---|
| SUSAN L. SWATZELL, On Behalf Of Herself And All Others Similarly Situated, | )NO. |
| | ) |
| Plaintiff, | ) JUDGE MANNING |
| | ) |
| v. | ) |
| | ) MAGISTRATE JUDGE NOLAN |
| BAXTER INTERNATIONAL INC., HARRY M. JANSEN KRAEMER, JR., and BRIAN P. ANDERSON, | ) |
| | )**JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |
| | ) |

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Baxter International Inc. ("Baxter" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal class action on behalf of purchasers of the securities of Baxter between January 24, 2002 and July 18, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated under Section 10(b) by the SEC [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, defendants maintain their chief executive offices and principal place of business within this District.

## PARTIES

6.     Plaintiff, Susan L. Swatzell, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Baxter at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Baxter International Inc. is organized under the laws of Delaware and maintains its principal executive offices at One Baxter Parkway, Deerfield, Illinois. Baxter is a diversified healthcare company, selling products and services internationally.

8.      Harry M. Jansen Kraemer, Jr. ("Kraemer") was Baxter's Chief Executive Officer and Chairman of the Board of Directors throughout the Class Period.

9.      Brian P. Anderson ("Anderson") was Baxter's Chief Financial Officer and Senior Vice President throughout the Class Period.

10.     Kraemer and Anderson are referred to collectively herein as the "Individual Defendants."

11.     During the Class Period, each of the Individual Defendants, as senior executive officers and directors of Baxter was privy to confidential and proprietary information concerning Baxter, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Baxter, as discussed in detail below. Because of their positions with Baxter, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to, the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company

3

to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Baxter's business.

13. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Baxter between January 24, 2002 and July 18, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times hereto, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Baxter had approximately 599 million shares of common stock outstanding, which were actively traded on the New York Stock Exchange (the "NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can

4

only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Baxter or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Baxter; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

20.     Baxter is a diversified healthcare company with worldwide operations. Its business is broken up into the following three segments:

(a)     Medication Delivery: sells products used in the intravenous delivery of medication;

(b)     BioScience: develops and sells biopharmaceuticals, biosurgery, vaccines and blood collection products; and

(c)     Renal: develops and markets products and services used to treat kidney disease, such as dialysis machines.

21.     Nearly 50% of Baxter's business is conducted overseas and the Company owns many production plants and other facilities overseas, including a Swedish facility used to produce certain types of dialysis machines.  In October 2001, six models of the dialysis filters manufactured in Baxter's Swedish facility were linked to three dozen patient deaths in Spain, Croatia, Taiwan and Colombia, prompting a recall of all such filters on October 15, 2001.  By early November 2001, the number of deaths thought to be linked to Baxter's products had risen to 51, including the deaths of two Nebraska residents.  The incidents received wide media coverage, with articles appearing in major newspapers throughout the nation and abroad, causing the price of Baxter common stock to drop steadily as reports regarding the dialysis-linked deaths surfaced daily.

6

22.     On November 5, 2001, Baxter issued a press release announcing that it believes that residues of a chemical used in the manufacturing process of the dialysis filters may have been responsible for the deaths, although it denied that a definitive causal relationship had been established. According to the press release, the processing fluid was used in only 10 percent of Baxter's A and AF series dialyzers produced in Sweden. Baxter announced that it would take a charge of $100-$150 million to cover the cost of discontinuing the product line and assured investors that despite the problems it would meet its financial targets for 2001, excluding the charges.

23.     In order to allay investor concerns over the detrimental effect of the scandal on its business and to allow insiders to profit from sales of Baxter common stock at artificially inflated prices, Baxter made statements throughout the Class Period highlighting strong revenue and earnings growth and assuring the market that its business, including the Renal division, was growing successfully and that it would meet its financial performance targets for 2002, with growth being driven by double digit sales growth in the Medication Delivery and BioScience segments and with sales in the Renal unit in the high-single-digits (compared with 3% sales growth in 2001). These representations were each materially false and misleading because defendants failed to disclose: i) that demand for products sold by the Renal Division had slowed following the deaths in late 2001, the Company was unable to successfully service the low-priced dialyzer market niche previously serviced by the Swedish dialyzers, which had been discontinued, and ii) that the Company was unable to expand the number of dialyzer centers in Latin America. In addition, defendants failed to disclose that the BioScience division was suffering from serious problems including capacity constraints and a saturated market for certain products and that the division's sales were not growing sufficiently to allow the Company to meet the revenue and earnings commitments that the Company

made throughout the Class Period. The Company's repeated assurances that it was on-track for its 2002 results were made without any reasonable basis in order to forestall a collapse in investor confidence following the dialyzer tragedy and to allow Baxter insiders to sell their personally-held Baxter common stock at artificially inflated prices. In addition, defendants were further motivated to commit the scheme alleged herein because Baxter had entered into an agreement to acquire the stock of Fusion Medical Technologies Inc. ("Fusion Medical") in a stock-for-stock transaction valued at approximately $157 million. A high stock price would translate into a more favorable exchange ratio for Baxter. Moreover, in order for the merger to be consummated, shareholders of Fusion Medical, who would become Baxter shareholders if the deal closed, had to vote in favor of the merger and Baxter was thus motivated to conceal the true problems with its operations at least until after the deal was effectuated.

24.     The scheme worked. The price of Baxter's common stock rose steadily throughout the Class Period thereby allowing Baxter insiders to sell a total of 434,700 shares of Baxter common stock at artificially inflated prices, and to reap gross proceeds totaling over $23.7 million. In addition, the artificially high stock price allowed Baxter to fix a favorable exchange ratio for the Fusion Medical acquisition and, indeed, the ratio was fixed while Baxter shares were trading very near the Class Period high.

25.     Then, on July 18, 2002, Baxter issued a press release announcing the financial results for its second quarter of 2002, the period ending June 30, 2002. Contrary to its repeated Class Period representations that it would meet its financial targets, Baxter reported only an 8% increase in sales for the quarter and a decline in net earnings, following the inclusion of two acquisition-related charges. The disappointing results were attributed to a decline in the Renal segment and sales in its

BioScience unit which were materially less than the Company previously assured investors its sales would be.

26.    In response to the announcement, the price of Baxter common stock plummeted by 36.5%, falling from a $43.41 per share close on July 17, 2002, to close at $32 per share on July 18, on extremely heavy trading volume.

27.    Subsequently, on July 29, 2002, Crain's Chicago Business reported on the ailing Renal unit's performance.  In relevant part, the article explained that the division was plagued with problems, from the dialyzer fiasco of late 2001 (from which the Company had not recovered) to a weak overseas market for Renal products that stifled the Company's plans to expand dialysis centers overseas.

### Materially False And Misleading
### Statements Made During The Class Period

28.    The Class Period begins on January 24, 2002.  On that date, Baxter issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2002. According to the press release, sales for the quarter were up 11%, to $2.14 billion, from the fourth quarter of 2000 while sales of $7.66 billion for the year 2001 also were up 11% over the year 2000 sales.  Excluding special charges, earnings for the quarter of $324 million were up 20% over the year-ago period, while earnings for the year 2001 grew 16% to $1.06 billion.  The Company attributed the sales growth to increased sales of BioScience products, namely Recombinate Antihemophilic Factor, an advanced treatment for hemophilia.  In addition, the Company reported that sales of Recombinate and smallpox vaccines would be the driving force behind BioScience's "mid-teen" sales growth in 2002.  The press release stated in pertinent part as follows:

In 2002, Baxter's BioScience business is projected to grow sales in the mid- teens, driven by increased sales of Recombinate, immune globulins and several vaccines. Baxter is participating in the production of approximately 155 million doses of smallpox vaccine, in conjunction with Acambis Inc. on behalf of the U.S. Department of Health and Human Services.

Baxter's Medication Delivery unit was also expected to grow sales "in the mid-teens in 2002, driven by additions to its drug delivery and infusion systems portfolios and growth in the oncology business." Finally, the press release represented that Baxter's Renal division, whose dialysis filters were linked to over 50 deaths worldwide in late 2001, was expected "to grow its Renal sales in the high-single-digits in 2002, through an increasing number of launches of new peritoneal dialysis and hemiodialysis products, as well as continued growth in its services business." Finally, the press release summarized the Company's expectations for 2002, with defendant Kraemer stating that the Company would continue to grow in the new year:

> Looking ahead for full-year 2002, Baxter expects to:
> Grow sales in the low-teens (at current foreign exchange rates).
> Grow earnings-per-share in the mid-teens.
> Generate operational cash flow of at least $500 million.
>
> We are well-positioned to yet again deliver solid growth in 2002, while substantially increasing our investments in a number of growth initiatives, including development of new recombinant proteins, vaccines, drug delivery platforms, oncology, pathogen inactivation and renal products, as well as continued expansion of our BioScience production capacity,' Kraemer added.

29.    On February 27, 2002, Baxter announced in a press release that it had entered into an agreement to acquire Fusion Medical for approximately $157 million. Baxter would use its stock as currency, offering to exchange its shares for shares of Fusion Medical, at a yet undetermined exchange ratio. According to the press release, Fusion Medical would be part of the BioScience unit, whose addition "expands and enhances [Baxter's] strong portfolio of biotherapeutic solutions for

surgery and tissue repair." The deal was subject to the approval of Fusion Medical shareholders and regulatory approval.

30.     On March 13, 2002, Baxter filed its 2001 annual report with the SEC on Form 10-K. The report was signed by defendant Kraemer. In a section of the report titled "Management's Discussion and Analysis," the Company represented that sales of Renal products in 2001 were driven by sales of products used for peritoneal dialysis, principally in Latin America and Asia. In addition, according to the report, the economic weakness and volatility in those regions would be offset by, among other things, the growth in demand for dialysis:

> The remaining sales growth in the Renal Segment was driven principally by continued penetration of products for peritoneal dialysis. The penetration continues to be strongest in emerging markets such as Latin America and Asia, where many people with end-stage renal diseases are currently under-treated. Sales in certain geographic markets continue to be affected by strong pricing pressures and the impact of market consolidation. **These issues are expected to be more than offset by increased penetration of peritoneal dialysis, growth in sales of hemodialysis products, product innovation, continued expansion into developing markets, and additional acquisitions and alliances. [Emphasis added].**

31.     The statements referenced above in ¶¶ 28 and 30, above, were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)     that Baxter's Renal Division was plagued with numerous problems which were adversely affecting its ability to operate its business such that it was not performing according to the Company's internal forecasts;

(b)     that the closure of the Company's Swedish dialyzer operations left it without any low-cost dialysis products thereby exposing it to increased competition. As a result, customers switched to other products causing Baxter to lose sales;

(c)     that Baxter's Renal Division was experiencing declining demand for its products on the heels of the deaths linked to certain of its dialyzers, was suffering declining sales and profits overseas, and could not grow its sales in the "high-single- digits" in 2002;

(d)     that the economic instability in certain of the Company's Latin American markets was forcing the Company to delay the expansion of its dialysis centers in the region, thereby causing the Company to experience slowing growth;

(e)     that the market for Albumin-based products, sold by the BioScience division, was over-saturated, resulting in a sharp decline in prices and negatively affecting BioScience's revenues -- especially at its US BioScience business;

(f)     that the BioScience division was suffering from capacity constraints, which caused its sales of IGIV, an intravenous immunoglobulin product, to fall well short of the Company's internal projections; and

(g)     that overall demand for Baxter's BioScience products was waning, except for sales of Recombinate, which was not a sufficiently large portion of the unit's sales to compensate for weakness in the unit's sales of other products.

32.     On April 18, 2002, Baxter issued a press release headlined "Strong First Quarter Positions Baxter Well to Meet Full Year 2002 Commitments." The Company reported that sales for the first quarter of 2002 were $1.95 billion, an 11% increase over the first quarter of 2001, while earnings of $0.41 per share were 17% above last year's first quarter earnings. Defendant Kraemer attributed the results to operational excellence and represented that the growth was sustainable:

> **"Our strong financial performance for the quarter reflects our focus and discipline around operational excellence and our commitment to achieve growth that is sustainable, profitable and capital efficient.** We continue to benefit from

the groundwork we've laid with expanded manufacturing capacity, continued successful integration of acquisitions, and advancement of key new technologies like our protein-free recombinant manufacturing, vero-cell vaccine and drug delivery platforms," said Harry M. Jansen Kraemer, Jr., chairman and chief executive officer. [Emphasis added].

In a section of the press release entitled "2002 Financial Commitments," Baxter reiterated its ability to grow sales at a percentage in the low teens:

2002 Financial Commitments:

"We are very excited about the milestones we've achieved in the first quarter, and are on track to achieve those planned for the remainder of the year, **Kraemer said, adding that the company is well positioned to meet its 2002 financial commitments of sales growth in the low teens, earnings per share growth in the mid-teens and operational cash flow of at least $500 million.**"

"With our focus on accelerating growth -- through new technologies, product launches and strategic partnerships -- we are confident that we will achieve our growth commitments this year, and be positioned well for the long-term with sustainable competitive advantage," Kraemer stated. [Emphasis added].

33.     The statements referenced above in ¶32 were each materially false and misleading for the reasons stated in ¶31. In addition, the statements referenced in ¶32 were also materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)     that demand for the Company's Renal and BioScience products had slowed and was expected to continue to slow for the remainder of 2002; and

(b)     that its sales growth was not sustainable.

34.     A couple of weeks after the release of the seemingly impressive first quarter financial results, on April 30, 2002, the Company announced that the exchange ratio for the Fusion Medical acquisition had been set at 0.1763 Baxter shares for each share of Fusion Medical. At the time,

13

Baxter's common stock was trading at $56.90 per share, only slightly lower than the Class Period high of $59.60 per share reached on March 27. Shareholder approval was obtained for the acquisition shortly thereafter and the deal closed on May 3.

## The Truth Emerges

35.     On July 18, 2002, Baxter reported its results for the second quarter of 2002, shocking the market with disappointing sales growth and massive impairment charges leading to a decline in earnings. Sales in the quarter rose only 8%, to $2.02 billion. Sales of BioScience products grew 7%, rather than in the "mid-teens," while the Renal unit experienced a decline of 1%, instead of the "high-single-digit" growth promised by the Company on April 18, 2002. Baxter's net earnings of $253 million, or $0.42 per share declined by 21% from the first quarter of 2001 after the Company recorded a $51 million charge for in-process research and development of its second quarter acquisition of Fusion Medical and a $70 million impairment charge reflecting a decline in the value of certain of the Company's investments.

36.     In response to the announcement, the price of Baxter common stock plummeted by 36.5%, falling from a $43.41 per share close on July 17, 2002 to close at $32 per share on July 18, on extremely heavy trading volume.

37.     On July 29, 2002, _Crain's Chicago Business_ reported that Baxter's Renal Division had not yet been able to replace the dialyzers which were linked to patient deaths with comparable substitutes:

> The renal division accounted for roughly one-quarter of the Deerfield-based medical products supplier's sales in 2001. It has suffered a series of setbacks, from defective dialysis filters that had to be pulled from the market to tumult in overseas markets that has hammered profit margins.

Unit backslides.

While the company's medication delivery and bioscience units grew 15% and 7%, respectively, in the second quarter, the renal division's sales slipped 1% from the year earlier period, to $473 million. That's a far cry from the double-digit growth rate the company was predicting for the unit, and still believes is possible.

One problem was that Baxter had to pull filters made by Althin Medical AB, a Swedish company that Baxter acquired in March 2000, and shut down its manufacturing facilities after the filters were implicated in the deaths of more than 50 people worldwide last fall. The company did not have an inexpensive substitute for the Althin products, and customers switched to competitive products. To offset the lost sales, Baxter must improve its portfolio of less expensive products like the filters.

In addition to decreased sales, the Company was unable expand to dialysis centers overseas, while unfavorable economic conditions, present throughout late 2001 and 2002 (factors which the Company stated in its annual report would be "more than offset"), eroded the unit's profit margins. According to the article:

Problems in the company's Asian and Latin American markets, where currency fluctuations and economic declines have cut into profit margins, are more difficult to offset. Baxter postponed expansion of dialysis centers in those markets, but said there is little it can do but wait for economic stability to return.

Finally, the article states that Alan Heller, president of the Renal division, acknowledged that its expectations for the unit were unrealistic, stating that **"Mr. Heller acknowledges that Baxter's expectations for the renal unit were too high, and calls the growth rate 'unacceptable.'"** [Emphasis added].

## ADDITIONAL SCIENTER ALLEGATIONS

38. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

15

disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Baxter, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Baxter, participated in the fraudulent scheme alleged herein.

39. The Individual Defendants were motivated to commit the fraud alleged herein so that Baxter could secure a favorable exchange ratio for the Fusion Medical deal and, in addition, *so that* Company insiders could sell their personally held shares of Baxter common stock at prices higher than if the truth about the Company's business was known. Indeed, during the Class Period, Baxter insiders sold a total of 435,700 Baxter common shares, reaping gross proceeds of $23,736,740, as set forth below.

**John Quick**, Corporate Vice President, Quality and Regulatory

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 1/28/02 | 200 | $52.78 | $10,556 |
| 1/28/02 | 200 | $52.90 | $10,580 |
| 1/28/02 | 1,100 | $52.79 | $58,069 |
| 1/28/02 | 2,666 | $52.91 | $141,048.06 |

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| | | $52.82 | $153,178 |
| 1/28/02 | 2,900 | | $459,447 |
| | | $52.81 | |
| 1/28/02 | 8,700 | | $2,258,308.80 |
| | | $52.80 | |
| 1/28/02 | 42,771 | | $586,524 |
| | | $52.84 | |
| 1/28/02 | 11,100 | | $1,093,995 |
| | | $52.85 | |
| 1/28/02 | 20,700 | | $125,280 |
| | | $52.20 | |
| 6/5/02 | 2,400 | | $131,175 |
| | | $52.47 | |
| 6/5/02 | 2,500 | | $130,975 |
| | | $52.39 | |
| 6/5/02 | 2,500 | | $130,925 |
| | | $52.37 | |
| 6/5/02 | 2,500 | | $130,850 |
| | | $52.34 | |
| 6/5/02 | 2,500 | | $130,840 |
| | | $52.34 | |
| 6/5/02 | 2,500 | | $130,825 |
| | | $52.33 | |
| 6/5/02 | 2,500 | | $130,700 |
| | | $52.28 | |
| 6/5/02 | 2.500 | | $130,375 |
| | | $52.15 | |
| 6/5/02 | 2,500 | | $135,850 |
| | | $52.25 | |
| 6/5/02 | 2,600 | | |

17

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 6/5/02 | 3,000 | $52.4 | $157,200 |
| 6/5/02 | 5,000 | $52.5 | $262,500 |
| 6/5/02 | 5,000 | $52.38 | $261,900 |
| 6/5/02 | 7,000 | $52.3 | $366,100 |
| 6/5/02 | 7,500 | $52.42 | $393,150 |
| 6/5/02 | 10,000 | $52.35 | $523,500 |
| 6/5/02 | 15,000 | $52.45 | $786,750 |
| **TOTAL** | **167,837** | | **$8,700,365.86** |

**Thomas J. Sabatino, Jr.**, Senior VP and General Counsel

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| **2/1/02** | **22,450** | **$55** | **$1,234,750** |

**Timothy B. Anderson**, Senior VP, Corporate Strategy and Development

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 2/1/02 | 16,750 | $55.88 | $935,990 |
| 2/1/02 | 10.533 | $55.89 | $588,686.37 |

18

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|------|------|------|
| 2/1/02 | 9,250 | $56.00 | $518,000 |
| 2/1/02 | 7,750 | $55.85 | $432,837.50 |
| 2/1/02 | 7,050 | $55.83 | $393,601.50 |
| 2/1/02 | 5,000 | $55.72 | $278,600 |
| 2/1/02 | 4,750 | $55.84 | $265,240 |
| 2/1/02 | 4,550 | $55.81 | $253,935.50 |
| 2/1/02 | 4,150 | $55.82 | $231,653 |
| 2/1/02 | 2,200 | $55.99 | $123,178 |
| 2/1/02 | 1,300 | $55.80 | $72,540 |
| 2/1/02 | 300 | $55.86 | $16,758 |
| **TOTAL** | **73,583** | | **$4,111,022.87** |

**Karen J. May,** Corporate VP, Human Resources

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|------|------|------|
| 2/5/02 | 33,000 | $55.90 | $1,844,700 |
| 2/5/02 | 260 | $55.98 | $14,554.80 |

19

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| **TOTAL** | **33,260** | | **$1,859,254.80** |

**James R. Hurley,** Corporate VP, Integration Management

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 2/5/02 | 10,000 | $55.25 | $552,500 |
| 2/5/02 | 5,000 | $55.75 | $278,750 |
| 2/5/02 | 100 | $55.50 | $5,550 |
| **TOTAL** | **15,100** | | **$836,800** |

**Gregory P. Young,** Corporate VP of Baxter Healthcare Corp.

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 3/1/02 | 6,200 | $55.10 | $341,620 |
| 3/1/02 | 2,988 | $55.12 | $164,698.56 |
| **TOTAL** | **9,188** | | **$506,318.56** |

**Eric A. Beard,** Corporate VP and President, Europe

| Date | No. Of Shares | Price/Share | Total Proceeds |
|------|---------------|-------------|----------------|
| 2/25/02 | 9,900 | $55.02 | $544,698 |
| 2/25/02 | 8,100 | $55.09 | $446,229 |

20

| Date | No. Of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 2/25/02 | 5,000 | $55.05 | $275,250 |
| 2/25/02 | 3,064 | $55.02 | $168,581.28 |
| 2/25/02 | 2,000 | $55.04 | $110,080 |
| 2/25/02 | 1,900 | $55.11 | $104,709 |
| 2/25/02 | 300 | $55.10 | $16,530 |
| 2/25/02 | 100 | $55.03 | $5,503 |
| 2/25/02 | 100 | $55.14 | $5,514 |
| **TOTAL** | **30,464** | | **$1,677,094.28** |

**Norber G. Reidel**, Corporate VP and Chief Scientific Officer

| Date | No. of Shares | Price/Share | Total Proceeds |
|---|---|---|---|
| 3/15/02 | 74,100 | $57.45 | $4,257,045 |
| 3/15/02 | 318 | $57.52 | $18,291.36 |
| **TOTAL** | **74,418** | | **$4,275.336.36** |

**James M. Gatling**, Corporate VP, Global Manufacturing Operations

| Date | No. of Shares | Price/Share | Total Proceeds |
|---|---|---|---|

21

| 3/15/02 | 9,400 | $57 | $535,800 |

### Undisclosed Adverse Information

40.     The market for Baxter's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Baxter common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until July 18, 2002, when Baxter revealed the true state of its business, as detailed above.  Plaintiff and other members of the Class purchased or otherwise acquired Baxter's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Baxter, and have been damaged thereby.

41.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Baxter common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

42.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Baxter's earnings.   These material misstatements and omissions created in the market an unrealistically positive assessment of Baxter and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

22

Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the truth was revealed, and the market was able to accurately value the Company.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

43.     At all relevant times, the market for Baxter's securities was an efficient market for the following reasons, among others:

(a)     Baxter's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Baxter filed periodic public reports with the SEC and the NYSE;

(c)     Baxter regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Baxter was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for Baxter's securities promptly digested current information regarding Baxter from all publicly available sources and reflected such information in Baxter's stock price. Under these circumstances, all purchasers of Baxter's securities

during the Class Period suffered similar injury through their purchase of Baxter's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Baxter who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, Baxter and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged

24

herein; (ii) artificially inflate and maintain the market price of Baxter's securities; and (iii) cause Plaintiff and other members of the Class to purchase Baxter's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Baxter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Baxter and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentality of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Baxter as specified herein.

50.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein to assure investors of Baxter's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Baxter and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein.

Defendants also engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Baxter's securities during the Class Period.

51. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

52. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Baxter's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

53. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Baxter's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Baxter's

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Baxter securities during the Class Period at artificially high prices and were damaged thereby.

54.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Baxter, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Baxter securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     Each of the Individual Defendants acted as a controlling person of Baxter within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, Baxter and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Baxter's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

28

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and on behalf of the Class, prays for judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as class representative of the Class and her counsel as class counsel;

(B)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this Action, including counsel fees and expert fees; and

(D)     Amending such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 28, 2002

> **MUCH SHELIST FREED DENENBERG
> AMENT & RUBENSTEIN, P.C.**
>
> *Carol V. Gilden*
>
> Carol V. Gilden, Esq.
> Michael E. Moskovitz, Esq.
> 200 North LaSalle Street, Suite 2100
> Chicago, IL  60601-1095
> Tel: (312) 346-3100

29

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Mel E. Lifshitz
Gregory M. Egleston
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, SUSAN L. SWATZELL                    ("Plaintiff"), declare the following as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard & Lifshitz, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification

4.      Plaintiff's transaction(s) in the BAXTER INTERNATIONAL, INC. security that is the subject of this action during the period of 1/24/02 through 7/18/02 are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 600 | BAX | BUY | 01/31/02 | $54.70 |
| | | | | |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper , if necessary.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for the class in any action filed under the federal securities laws except as indicated here:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of August, 2002.

Signature

SUSAN L. SWATZELL
Print Name

S:\Secra\BAX\1\blank.certification.wpd